IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

HARRISON LEE BLETSON,

        Petitioner,

    v.

BRIAN BELLEQUE,

        Respondent.

Case No. 3:09-cv-1057-BR

OPINION AND ORDER

STEPHEN R. SADY
Chief Deputy Federal Public Defender
101 SW Main St
Suite 1700
Portland, OR  97204

      Attorneys for Petitioner

ELLEN F. ROSENBLUM
Attorney General
LYNN DAVID LARSEN
Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR  97301

      Attorneys for Respondent

1 - OPINION AND ORDER -

BROWN, Judge.

Petitioner, an inmate at the Oregon State Penitentiary, brings this habeas corpus action pursuant to 28 U.S.C. § 2254. For the reasons that follow, the Court DENIES the Petition for Writ of Habeas Corpus.

## PROCEDURAL BACKGROUND

On April 23, 1997, a Multnomah County grand jury indicted Petitioner on three counts of Aggravated Murder and one count of Robbery in the First Degree as follows:

### COUNT 1

#### AGGRAVATED MURDER

The said defendant, on or between April 14, 1997 and April 15, 1997, in the County of Multnomah, State of Oregon, did unlawfully and intentionally commit and attempt to commit the crime of Robbery in the First Degree and in the course of and in the furtherance of said crime which the said defendant was committing and attempting to commit, the said defendant personally and intentionally did cause the death of another human being to-wit: DANNELLA BLETSON, a person who was not a participant in the crime, contrary to the Statutes in such cases made and provided and against the peace and dignity of the State of Oregon.

### COUNT TWO

#### AGGRAVATED MURDER

The said defendant, on or between April 14, 1997 and April 15, 1997, in the County of Multnomah, State of Oregon, did unlawfully and intentionally, in an effort to conceal the identity of a perpetrator of the crime of theft, cause the death of another human being, to-wit: DANNELLA BLETSON, contrary to the Statutes in such cases made and provided and against the peace and dignity of the State of Oregon.

2 - OPINION AND ORDER -

COUNT 3

AGGRAVATED MURDER

The said defendant, on or between April 14, 1997 and
April 15, 1997, in the County of Multnomah, State of
Oregon, did unlawfully and intentionally, in an effort
to conceal the commission of the crime of theft, cause
the death of another human being, to-wit:  DANNELLA
BLETSON, contrary to the Statutes in such cases made and
provided and against the peace and dignity of the State
of Oregon.

COUNT 4

ROBBERY IN THE FIRST DEGREE

The said defendant, on or between April 14, 1997 and
April 15, 1997, in the County of Multnomah, State of
Oregon, did unlawfully and knowingly threaten the
immediate use of physical force upon DANNELLA BLETSON,
and did use a dangerous weapon, to-wit:  a knife, while
in the course of committing and attempting to commit
theft of property, to-wit:   personal property and
checks, with the intent of preventing and overcoming
resistance to the said defendant's taking and retention
immediately after the taking of the said property,
contrary to the Statutes in such cases made and provided
and against the peace and dignity of the State of
Oregon.

Resp. Exh. 102, pp. 1-2.  The charges arose from the robbery and

killing of Petitioner's mother, Dannella Bletson.

On December 10, 1998, a jury found Petitioner not guilty of

the charges alleged in Counts 2 and 3 of the Indictment:

Aggravated Murder Committed to Conceal the Identity of the

Perpetrator of the Theft, and Aggravated Murder to Conceal the

Commission of the Crime of Theft.  The jury, however, convicted

Petitioner on the Aggravated Murder charge alleged in Count 1:

3 - OPINION AND ORDER -

Murder Committed During Robbery or Attempted Robbery.  The jury also convicted Petitioner on the lesser included offense of Murder on Counts 2 and 3, and on the crime of Robbery in the First Degree alleged in Count 4.

The case then proceeded to the penalty phase.  At the end of the penalty phase, the prosecutor decided not to seek the death penalty.  The jury returned a verdict of life with the possibility of parole after 30 years on the Aggravated Murder charge.  The convictions merged for the purposes of sentencing, and on December 21, 1998, the trial judge imposed an aggregate sentence of life with the possibility of parole after 30 years.

Petitioner filed a direct appeal.  He raised three claims for relief:

> 1.   Whether the state's evidence was constitutionally insufficient to prove beyond a reasonable doubt that the victim was "robbed" and that she was killed in the course of a "robbery."
>
> 2.   Whether the arresting officer's question to Petitioner "Are you hurt?" constituted interrogation without *Miranda*, in the context of a homicide investigation involving a stabbing, such that Petitioner's response, "No, I'm okay, and I'm sorry about everything that happened" should have been suppressed.
>
> 3.   Whether the trial court erred in giving the "acquit first" instruction over Petitioner's objection.

The Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review.  *State v. Bletson*, 181 Or.

4 - OPINION AND ORDER -

App. 126, 46 P.3d 229, *rev. denied*, 334 Or. 491, 52 P.3d 1057 (2002).

Petitioner then sought state post-conviction relief ("PCR"). Petitioner ultimately argued three claims for relief to the PCR trial court:

> 1.    Trial counsel provided ineffective assistance of counsel by erroneously advising Petitioner that if he testified at trial it would open the door for the introduction of testimony from a jail-house informant.
>
> 2.    Trial counsel provided ineffective assistance of counsel because Petitioner would have testified in his own behalf but for the erroneous advice.
>
> 3.    Trial counsel provided ineffective assistance of counsel by failing to object to hearsay testimony of statements made by the victim the morning of the killing.

Following an evidentiary hearing, the PCR trial judge denied relief. On appeal, the Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review. *Bletson v. Belleque*, 228 Or. App. 367, 208 P.3d 1057, *rev. denied*, 346 Or. 589, 214 P.3d 821 (2009).

On September 3, 2009, Petition filed his Petition for Writ of Habeas Corpus in this Court. The Petition alleges five claims for relief:

> 1.    The state's evidence was insufficient to prove beyond a reasonable doubt that the victim was "robbed" and that she was killed in the course of a "robbery."
>
> 2.    The trial court erred by not suppressing Petitioner's custodial statement "No, I'm okay. I'm sorry for everything that happened," when that statement

5 - OPINION AND ORDER -

was a response to custodial interrogation without the
benefit of *Miranda* warnings.

3.    The trial court erred in giving the "acquit first"
jury instruction.

4.    Trial counsel provided ineffective assistance of
counsel by improperly discouraging Petitioner from
testifying in his own defense.

5.    Trial counsel provided ineffective assistance of
counsel by repeatedly failing to object to hearsay
testimony.

The Court appointed counsel to represent Petitioner.  In the
Memorandum in Support of Petition for Writ of Habeas Corpus,
counsel addressed only the first and fifth grounds for relief.
Thus, Respondent argues Petitioner is not entitled to habeas
corpus relief on the claims not addressed and that the state court
decisions denying relief on the first and fifth grounds for relief
are entitled to deference.

### SUMMARY OF FACTS

Petitioner lived with his mother in her northeast Portland
home where other family members often stayed with them.  Family
and friends testified that Petitioner and his mother had a great
relationship.  Petitioner, however, had a drug problem that caused
friction between him and his mother.  When he used drugs,
Petitioner would sometimes steal things from his mother and sell
them for drug money.  At the end of a binge, he would try to make
amends and retrieve the items he had stolen from his mother or try
to pay her back.

Mrs. Bletson had a steel security door installed in front of her bedroom door to protect her valuables from Petitioner. She would generally lock the door when she left the house, although when Petitioner was in the midst of a drug binge, she would keep it locked all the time. She also installed an extra deadbolt on the back door to the house and did not give Petitioner a key. If Petitioner was out on a drug binge, his mother would use that deadbolt to keep him out of the house.

Doris Capers is the mother of Petitioner's children. Ms. Capers was a close friend of Mrs. Bletson and worked with Mrs. Bletson at a beauty shop owned by Mrs. Bletson and her daughter. At 9:00 on the morning of April 14, 1997, Mrs. Bletson called Doris Capers and asked her if she had seen Petitioner. Mrs. Bletson told Ms. Capers she was worried because she thought Petitioner was out getting high.

At approximately 10:00 a.m., Mrs. Bletson called Ms. Capers again and told her she did not want Petitioner to know she was at home because she assumed Petitioner was doing cocaine. An hour later she called Ms. Capers a third time. They talked about Petitioner and about how Mrs. Bletson was ready to have Petitioner move out because of his drug problem.

Sometime between 11:00 and 11:10 a.m., Robert Minor, a telephone service man loaned Petitioner a ladder to enter the locked home through a second-story window. Mrs. Bletson was

7 - OPINION AND ORDER -

apparently on the telephone with Ms. Capers when Petitioner entered the home, but she did not seem scared or alarmed. Sometime later, Mrs. Bletson confronted Mr. Minor as he sat in his truck outside.  Minor testified that Mrs. Bletson said, "'That's my son, and she laughed, and that was it."  Trans., Vol. 2, p. 129.

While Mrs. Bletson was outside talking with Mr. Minor, Ms. Capers called the house.  Petitioner answered.  He told Ms. Capers his mother was outside and he would tell her Ms. Capers had called.

Sometime before noon, Mrs. Bletson called Ms. Capers back. The conversation lasted approximately 15 minutes.  Mrs. Bletson told Ms. Capers she was angry at the service man for giving Petitioner a ladder to get into the house.

Approximately 20 minutes after that call ended, Mrs. Bletson called Ms. Capers again, but during this call, Mrs. Bletson was whispering.  The two talked about Petitioner's drug problems and, according to Ms. Capers, "[Mrs. Bletson] said that [Petitioner] wasn't finished, and I said, 'Well, Nana, how do you know?'  And she said that he's got his coat on and he's getting ready to go out the door."  Trans., Vol. 3, p. 155.  Ms. Capers understood "finished" to mean that Petitioner was leaving to do more drugs. Mrs. Bletson did not say whether Petitioner had any property in his hands or that she heard anything unusual.  At approximately

8 - OPINION AND ORDER -

12:35 to 12:45 p.m., Mrs. Bletson told Ms. Capers she would call back, and hung up.  Mrs. Bletson, however, did not call back.

At 1:28 p.m., a Federal Express delivery person attempted to deliver a package to Mrs. Bletson at the house.  He received no response when he knocked on the door.

Earlier that day, around 10:00 a.m., a close friend of Mrs. Bletson, Henry Knight, called Mrs. Bletson and they made a 2:00 p.m. lunch date.  Mr. Knight was to pick up Mrs. Bletson.  Just after 1:00 p.m., Mr. Knight called Mrs. Bletson and got a busy signal, which he found unusual because Mrs. Bletson had call waiting.  Mr. Knight kept trying to call Mrs. Bletson, but the phone was busy.  Finally, at 2:00 p.m., Mr. Knight went to Mrs. Bletson's house and knocked on the back door but got no answer.

After waiting outside for a while, Mr. Knight left.  He kept calling Mrs. Bletson's house throughout the day and night, without success.  On Tuesday, April 15th, Mr. Knight called Mrs. Bletson's house at about 8:30 a.m.  This time the phone rang with no answer.  At 9:00 a.m., Mr. Knight called Mrs. Bletson's daughter, Rosa Washington, and told her he thought something was wrong at her mother's house.

After she received the call from Mr. Knight, Ms. Washington sent Alma Barney, a friend of Ms. Washington and Mrs. Bletson, over to Mrs. Bletson's house.  Ms. Barney went to the house between 10:00 and 10:20 a.m.   She got no response when she

9 - OPINION AND ORDER -

knocked on the door.   Ms. Barney retrieved a key from Ms. Washington and returned to the house, where she found Mrs. Bletson dead on the kitchen floor.   Ms. Barney called the police.

Mrs. Bletson had been stabbed 17 times.   Most of the wounds were superficial, but one to the front of her abdomen was fatal. The knife used to murder Mrs. Bletson was still in her back. There were pieces of a broken cast iron skillet on the floor around her body, and her body showed evidence she had been struck more than once with a blunt object.   When Mrs. Bletson was found, she had been dead for 12-24 hours.

The murder weapon, a knife, was examined but no prints were found.   There was relatively little blood spatter in the kitchen area, with no blood visible to the unaided eye on any surface in the kitchen.   After the entire kitchen was dusted for prints, it was determined there was one fingerprint and partial hand print that did not match those who regularly visited the kitchen.   A fingerprint from a glass found on the kitchen counter matched Petitioner.

The police found no evidence of forced entry, and nothing was amiss on the first floor of the house.   However, the steel security door to Mrs. Bletson's room was open and the wooden bedroom door had been forced open.   There was a shoe print on the wooden door.   The shoe mark had size and pattern similarities to the boots Petitioner was wearing when he was arrested.

10 - OPINION AND ORDER -

Mrs. Bletson's bedroom had been ransacked. There were receipts and financial documents, including check books, strewn about the bed. There was also a small jewelry box open on Mrs. Bletson's bed and all her dresser drawers were open and appeared to have been searched. The bathtub adjacent to Mrs. Bletson's bedroom was partially filled with clean water. No other area of the house, including Petitioner's bedroom, appeared disturbed.

After speaking with Ms. Washington, the police looked for Petitioner in the house, because he would normally have been home from work sleeping. They did not find him in the house, and determined that he had not attended his scheduled work shift on April 14th from 7:00 p.m. to 7:00 a.m.

On the morning of April 14, Petitioner was at Gerald Patrick's house following a night of smoking crack cocaine. By morning, Petitioner owed Gerald Patrick money and said that he was going to the credit union to get the money and would come back. Gerald Patrick asked his brother, Timothy Patrick, to give Petitioner a ride.

Petitioner left with Timothy Patrick. They did not go to the credit union. Instead, they drove to Mrs. Bletson's house. Timothy Patrick testified that Petitioner went to the back door and shook it, and said "Mom, let me in." Trans., Vol. 4, p. 255. From there, Petitioner went to the garage and looked in, and then went to the front of the house. Petitioner went to a neighbor's

11 - OPINION AND ORDER -

house and called Ms. Capers to ask if she knew where his mother
was.   Petitioner then borrowed the ladder from Mr. Minor and
entered the house through a second-story window.

Petitioner returned to the car, where he told Timothy Patrick
he did not have the money to repay Gerald Patrick for the drugs.
Timothy Patrick and Petitioner returned to Gerald Patrick's house
approximately 45 minutes after they had left.   Petitioner stayed
at Gerald Patrick's house until 1:30 p.m., with one five-minute
absence when Petitioner left to unsuccessfully borrow money from
George Anthony Phillips.

Anita Ward, a longtime friend of Petitioner's ran into
Petitioner at approximately 7:00 or 8:00 p.m. the evening of April
14 at Nina Jones's house which was nearby Mrs. Bletson's house.
Nina Jones and Petitioner were playing dominos and smoking crack
cocaine.   Anita Ward joined them.

After about an hour-and-a-half they ran out of crack cocaine.
Petitioner asked Ms. Ward if she knew anyone who would be
interested in buying a bracelet.   She said she thought her
daughter might be interested.   Petitioner left and returned 10 to
15 minutes later with two bracelets.   Ward's daughter gave
Petitioner crack cocaine valued at $30 for one of the bracelets.

Two hours later, after that crack cocaine had been smoked,
Petitioner asked if anyone was interested in buying a leather coat
that he had at his house.   Anita Ward walked with Petitioner to

12 - OPINION AND ORDER -

Mrs. Bletson's house.  Petitioner went around the side of the house while Ms. Ward stayed on the street.  Shortly thereafter Petitioner emerged from the side of the house with a green leather jacket.  Petitioner and Ward then tried to find a buyer for the coat, and Petitioner spent the rest of the night at Nina Jones's house.

On the morning of April 15, Petitioner asked George Anthony Phillips if he could have a ride to the Check-Mart.  After Petitioner was not able to cash a $300 check written on Mrs. Bletson's account, Phillips drove Petitioner to several other banks.  Phillips helped Petitioner forge a check, and the two eventually succeeded in cashing three checks written on Mrs. Bletson's account.  The two bought more crack cocaine and went together to Phillips's house in Vancouver, Washington.  There they smoked crack cocaine for several hours.

In the late afternoon of April 15, Phillips noticed his mother and sister in his driveway, talking on the phone. Petitioner asked Phillips not tell to them Petitioner was there, and he went into a back room.  Phillips then opened the front door to speak with his sister.  She told Phillips that Mrs. Bletson was dead and asked Phillips if he had seen Petitioner.  Phillips went back in the house.  As he was getting his coat, Petitioner again said "Don't tell anybody where I am at."  Trans., Vol. 7, p. 529-30.

13 - OPINION AND ORDER -

The Phillips family drove to Portland. Upon arriving at Mrs. Bletson's house, George Phillips told police Petitioner was at his house in Washington, and gave his consent to have his home searched.

At 10:30 to 11:00 p.m., eight Vancouver police officers arrived at Phillips's house. Petitioner would not respond to calls to come out, so, following a knock and announce, the officers broke the door open and, with guns drawn, ordered Petitioner down. Petitioner immediately complied, and within seconds the officer handcuffed him.

Officer King noticed a fresh, non-bloody wound on Petitioner's right hand. After escorting Petitioner to the curb but before reading Petitioner his *Miranda* rights, Officer King asked Petitioner whether he was hurt. Petitioner replied "No, it's okay. I'm sorry about everything that's happened." Trans., Vol. 7, p. 582. Later, after he was placed in the patrol car, Petitioner said "I could have left at any time. I waited for you guys." Trans., Vol. 7, p. 583.

The police conducted various tests on the clothing seized from Petitioner upon his arrest. Criminalist Humphreys testified that the front fly area of Petitioner's pants contained medium velocity spatter blood consistent with Mrs. Bletson's blood type. He described the spatter as three small drops of blood approximately a quarter inch in diameter. There were also blood

14 - OPINION AND ORDER -

smears on Petitioner's pants consistent with Petitioner's DNA blood type.

There also was evidence which did not necessarily point to Petitioner as the murderer, such as the fingerprint and palm print found in the kitchen that did not match any known person in the case and the fact that no fingerprints were found on the murder weapon or on the broken skillet. In addition, fibers collected from the scene could not be matched to any other piece of evidence.

Defense expert Ray Grimsbo testified that, given the types of wounds Mrs. Bletson suffered, he would have expected more blood to be on the assailant than was found on Petitioner's clothing. He also testified that the blood spatter pattern found on Petitioner's clothing was not consistent with what he would expect from the assault on Mrs. Bletson. In addition, if the perpetrator had cut himself with the knife, Dr. Grimsbo testified he would have expected to see a mixture of the victim's and the perpetrator's blood on the knife.

Petitioner's daughter, Shanee Bletson, testified that in November 1996, she overheard two men threatening Petitioner with a crowbar, and the police had to be called. Because of that incident, Mrs. Bletson later sent Petitioner out of town to Seattle for a while for his protection.

15 - OPINION AND ORDER -

## LEGAL STANDARDS

Under 28 U.S.C. § 2254(d), an application for a writ of habeas corpus shall not be granted unless the adjudication on the merits in State court was:

(1) contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In *Williams v. Taylor*, 529 U.S. 362, 386-389 (2000), the Supreme Court construed this provision as requiring federal habeas courts to be highly deferential to the state court decisions under review. In *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-1402 (2011), the Court reiterated the highly deferential nature of federal habeas review, and limited federal review "to the record that was before the state court that adjudicated the claim on the merits."

"'Clearly established Federal law' is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004), *cert. denied*, 546 U.S. 963 (2005). An "unreasonable application" of clearly established federal law occurs when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but

unreasonably applies that principle to the facts of the prisoner's case." *Lambert*, 393 F.3d at 974 (citing *Williams*).

"The state court's application of law must be objectively unreasonable." *Williams*, 529 U.S. at 411 (emphasis added). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied clearly established federal law erroneously or incorrectly." *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (internal citations omitted).

"[A] habeas court must determine what arguments or theories . . . could have supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Pinholster*, 131 S. Ct. at 1402 (citing *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

**DISCUSSION**

I.   **Grounds Two, Three, and Four:   Claims Not Addressed in Memorandum in Support**

In his Memorandum in Support, Petitioner does not address in the claims alleged in Grounds Two, Three, and Four of his Petition.   Upon the Court's review of the unaddressed claims, Petitioner is not entitled to relief on the grounds alleged in the Petition but not addressed in the Memorandum in Support.   *See* 28 U.S.C. § 2248 ("[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent the judge finds from the evidence that they are not true.")

On this record, the Court concludes the state court decisions denying relief on the claims alleged in Grounds Two, Three, and Four were not contrary to or an unreasonable application of clearly established federal law.   Accordingly, the decisions are entitled to deference and federal habeas corpus relief is not warranted on the claims alleged in Grounds Two, Three, and Four.

II.  **Ground One:  Insufficient Evidence**

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364(1970).   A state prisoner who

alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, which, if proven, entitles him to federal habeas relief. *Jackson v. Virginia*, 443 U.S. 307, 321 (1979).

"*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam); *see also Parker v. Matthews*, 132 S. Ct. 2148, 2012 WL 2076341, at *3-4 (2012) (per curiam) (applying this "twice-deferential standard" and holding that a state supreme court's rejection of a *Jackson* claim was "controlling in this federal habeas proceeding"). As the Supreme Court recently explained:

> First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* (quoting *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010)).

*Coleman*, 132 S. Ct. at 2062.

Under Oregon law, criminal homicide constitutes murder:

(b) when it is committed by a person, acting either alone or with one or more persons, who commits or attempts to commit any of the following crimes and in the course of an in furtherance of the crime the person is committing or attempting to commit, or during the immediate flight therefrom, the person, or another participant if there be any, causes the death of a person other than one of the participants:

* * *

(G)   Robbery in the first degree as defined in Or. Rev. Stat. § 164.415.

Or. Rev. Stat. § 163.115(1). Oregon's Aggravated Murder statute under which Petitioner was convicted states that "'aggravated murder' means murder as defined in Or. Rev. Stat. § 163.115 which is committed under the following circumstances:   "(2)(d) [T]he defendant personally and intentionally committed the homicide under the circumstances set forth in Or. Rev. Stat. § 163.115(1)(b)."  Under Or. Rev. Stat. § 164.415, Robbery in the First Degree requires a finding that the person charged has, in the course of committing or attempting to commit theft, been armed with a deadly weapon and threatened the use of immediate physical force with the intent of preventing and overcoming the victim's resistance to his taking of the property.

Petitioner argues the evidence presented at trial was insufficient to prove that Petitioner robbed the victim in the course of murdering her and vice versa.  Petitioner unsuccessfully

raised this argument in his motion for acquittal at trial, and on direct appeal.

After the prosecutor rested his case at trial, defense counsel moved for a judgment of acquittal, arguing that the State failed to present sufficient evidence that there was a robbery. The trial judge denied the motion with the following explanation:

> THE COURT:  Well, obviously, this is a circumstantial evidence case.  There is no direct evidence as to exactly what happened at the time she was killed.  And while there a number of facts and circumstances and direct evidence of things that occurred around, before, and after, the incident, there are enough inferences viewed in the light most favorable to the State that Dannella Bletson was attempting to keep her property from leaving the house at one point, whatever property it happened to be that hadn't been taken at that point, and then a violent struggle occurred and that she lost her life in that struggle and that property was taken.
>
> I think that the fuse [sic] of the scene, [Petitioner's] efforts to get in the house, the fact that he had the property afterwards, or some of it, all of that I think is sufficient viewed in the light most favorable to the State on the elements that are required in Counts 1, 2, 3, and 4.

Trans. Vol 5, pp. 1102-1103.  Defense counsel renewed the motion for judgment of acquittal at the close of evidence, but the trial judge denied it again.

The trial judge instructed the jury on the Aggravated Murder charge alleged in Count 1 of the indictment as follows:

> THE COURT:  Oregon law provides that a person commits the crime of Aggravated Murder if that person intentionally causes the death of another human being under or accompanied by certain defined circumstances.

In this case, to establish the crime of Aggravated Murder, the State must prove beyond a reasonable doubt the following three elements: The act occurred in Multnomah County Oregon; that the act occurred on or between April 14th and April 15th, 1997, and that [Petitioner] intentionally caused the death of Dannella Bletson, another human being, in an effort to consider the commission of a crime.

* * *

And now to the final and last count, which is Robbery in the First Degree. Oregon law provides that the crime of robbery, that a person commits the crime of Robbery in the First Degree, if in the course of committing or attempting to commit Theft, the person threatens the immediate use of physical force on another person with the intent of preventing or overcoming the resistance to his taking of the property and retention of the property immediately after the taking and uses a dangerous weapon.

In this case, to establish the crime of Robbery in the First Degree, the State must prove beyond a reasonable doubt six elements. First, that the act occurred in Multnomah County, Oregon; next, that the act occurred on or between April 14th, 1997 and April 15th, 1997; third, that [Petitioner] committed or attempted to commit theft; fourth that [Petitioner] in the course of committing or attempting to commit Theft threatened the use of immediate physical force upon Dannella Bletson; five, that [Petitioner] acted with the intent of preventing and overcoming the resistance to his taking of the property, and six, that [Petitioner] used a dangerous weapon.

Trans. Vol. 5, pp. 1303-1305.

On direct appeal to the Oregon Court of Appeals and in his Petition for Review to the Oregon Supreme Court Petitioner argued that the State's evidence was insufficient to prove beyond a reasonable doubt that Dannella Bletson was robbed, and that she was killed in the course of a robbery. According to Petitioner,

while the state's evidence sufficiently demonstrated that the victim was murdered and her property was subsequently stolen, the evidence did not show beyond a reasonable doubt the necessary relationship between the force (i.e., the murder) and the theft committed against the victim. Resp. Exh. 103, p. 13.  The Oregon courts rejected this argument.

After a careful review of this record, the Court concludes Petitioner has failed to demonstrate that there is no possibility for fairminded disagreement over whether "no rational trier of fact" could have found Petitioner guilty.  Among other things, there was ample evidence that the victim had been hit with the cast iron skillet and stabbed 17 times, with the knife left stuck in her back.  Her bedroom door had been kicked in, the room had been ransacked and her property was taken.  Petitioner had been in the victim's residence and was found with some of her stolen property shortly after her death.  In the light most favorable to the prosecution, this evidence and the rest of the record supports the jury's verdict that Petitioner committed a homicide in the course of the commission of a robbery.  Petitioner is not entitled to federal habeas corpus relief on his insufficient evidence claim.

### III. Ground Five:  Ineffective Assistance of Counsel for Failure to Object to Hearsay Statements

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must demonstrate "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S. Ct. at 790 (citations omitted).

To prove a deficient performance of counsel, a petitioner must demonstrate that trial counsel "made errors that a reasonably competent attorney as a diligent and conscientious advocate would not have made." *Butcher v. Marquez*, 758 F.2d 373, 376 (9th Cir. 1985).  The test is whether the assistance was reasonably effective under the circumstances, and judicial scrutiny must be highly deferential, with the court indulging a presumption that the attorney's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

To establish the second prong of the *Strickland* test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  In determining whether a defendant was prejudiced by ineffective assistance of counsel, the court should examine whether the

"'result of the proceeding was fundamentally unfair or unreliable.'" *United States v. Palomba*, 31 F.3d 1456, 1460-61 (9th Cir. 1994) (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 368 (1993)).

Petitioner contends trial counsel was constitutionally ineffective for failing to object to hearsay statements. The PCR trial judge considered and rejected this claim. In his Findings of Fact, Conclusions of Law, the PCR judge stated:

FINDINGS OF FACT

* * *

11.   Claim 10 F alleges that trial counsel failed to object to hearsay statements purportedly made by victim. The Court finds that trial counsel was not ineffective in failing to object to hearsay statements purportedly made by the victim because trial counsel made a deliberate tactical choice to allow the statements in as evidence without objection as a way to avoid the death penalty. Trial counsel's strategy proved effective in avoiding the death penalty.

CONCLUSIONS OF LAW

1.   Based on the findings of fact set forth above, in the underlying criminal proceedings resulting in petitioner's conviction, petitioner was not denied the right to assistance of counsel, as guaranteed by either the United States Constitution and as articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), or the Constitution of the State of Oregon.

* * *

5.   Petitioner did not prove the facts underlying any of his post-conviction claims by a preponderance of evidence. Thus petitioner has not shown, as

> required by *Strickland*, (1) that counsel's
> representation fell below an objective standard of
> reasonableness, and (2) that there is a reasonable
> probability that, but for counsel's allegedly
> unprofessional errors, the result of the
> proceedings would have been different.

Resp. Exh. 119, pp. 8-9.

The PCR trial judge's decision is supported by the record.

Trial counsel addressed this claim in his affidavit to the PCR

court, stating:

> The statements that petitioner complains about were not
> objected to because of a deliberate tactical choice by
> the defense. The defense's main focus throughout the
> case was avoiding a sentence of death or life without
> parole for the petitioner. The case against petitioner
> was very strong, and petitioner's expected inability to
> testify persuasively on his own behalf left the defense
> little evidence to offer during the guilt phase. In the
> absence of a true "factual defense" to the charges, and
> with the state holding open the possibility of asking
> for the death penalty, [co-counsel] and I decided to
> "frontload" mitigation evidence by introducing -- and
> not objecting to -- evidence of the petitioner's drug
> problem, and his family's struggle with it, during the
> guilt phase of the trial. As it turned out, the state
> later decided against seeking the death penalty (a
> decision we were informed of at the end of the guilt
> phase), and I believe that the defense's strategy was
> successful in persuading the jury not to impose a
> sentence of life without the possibility of parole.

Resp. Exh. 113, pp. 4-5.

In *Frost v. Nixon*, 543 U.S. 175 (2004), the Supreme Court

concluded that just such a "frontloading" strategy was

constitutionally effective. There, the defendant was removed from

the court proceedings because he was disruptive. In the absence

of his client and without his consent, defense counsel conceded

26 - OPINION AND ORDER -

guilt in order to frontload mitigating evidence for the jury.  The

Court concluded that, in light of the evidence against his client,

this strategy was not deficient.    The Court recognized that

"[a]lthough such a concession in a run-of-the-mine trial might

present a closer question, the gravity of the potential sentence

in a capital trial and the proceeding's two-phase structure

vitally affect counsel's strategic calculus."  *Id.* at 190-91.

The PCR court's decision denying relief on Petitioner's claim

was not based on an unreasonable determination of the facts in

light of the evidence presented and was not contrary to or an

unreasonable application of *Strickland*.   As such, Petitioner is

not entitled to federal habeas corpus relief on his ineffective

assistance of counsel claim.  Accordingly, Petitioner is not

entitled to habeas corpus relief.[1]

---

[1]This court joins other judges of this District who have
rejected the assertion Petitioner advances here, that the PCR court
incorrectly applied a preponderance of the evidence standard in
applying *Strickland*.  "The application of the preponderance of the
evidence standard to the underlying facts, in accordance with Or.
Rev. Stat. § 138.620(2), does not equate with the post-conviction
court applying the preponderance of the evidence standard in its
application of *Strickland*."    *Elkins v. Belleque*, Case No.
06-CV-1180-MA, 2008 WL 5046386, at *9 (D.Or.2008) (citing
*Mariano-Santos v. Blacketter*, 532 F.Supp.2d 1254, 1257-58 (D.Or.
2006), aff'd, 266 Fed. Appx. 593 (9th Cir .), cert. denied, ---
U.S. ----, 129 S.Ct. 87, 172 L.Ed.2d 75 (2008)); *Wilkerson v.
Blacketter*, Case No. 05-CV-1562-KI, 2007 WL 2693419, at *3
(D.Or.2007), aff'd, 290 Fed. Appx. 993 (9th Cir.2008); *Fuller v.
Hill*, Case No. 05-CV-506-TC, 2007 WL 2733824, at *4 (D.Or.2007),
aff'd, 292 Fed. Appx. 545 (9th Cir.2008)).

**CONCLUSION**

For these reasons, the Court DENIES the Petition for Writ of Habeas Corpus (#2) and DISMISSES this action.

The Court DENIES a certificate of appealability as Petitioner has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this ___19th___ day of September, 2012.

_____
ANNA J. BROWN
United States District Judge